UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                               :

**UNITED STATES OF AMERICA**,

                         Plaintiff,

       – against –

**SHARIF ALLEYNE**,

                        Defendant.

-------------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

20-CR-266 (AMD) (RER)

**ANN M. DONNELLY**, United States District Judge:

      The defendant is charged with violating 18 U.S.C. § 922(g), being a felon in possession of a firearm.  Before the Court is his motion to suppress a gun recovered during a May 15, 2019 arrest,[1] as well as statements the defendant made shortly after his arrest that day and when he was arrested on federal charges on July 14, 2020.  A suppression hearing was held on April 15 and 19, 2021.  The parties submitted post-hearing briefing, and I heard oral argument on September 16, 2021, after which the parties submitted additional post-hearing briefing.  For the reasons that follow, the defendant's motion is granted in part and denied in part.

## BACKGROUND[2]

### I.     May 15, 2019 Arrest

      In May of 2019, Police Officers Carlos Herrera,[3] Brian Doyle and Conway Hughes were assigned to the Brooklyn North Borough Crime team.  Herrera, a nine-year veteran of the NYPD,

---

[1] The defendant also moves to suppress DNA evidence collected from the gun.  (ECF No. 19 at 4; ECF No. 20 at 8.)

[2] The facts are based on testimony and evidence admitted at the hearing, including footage from the officers' body cameras.

[3] Herrera was promoted to the rank of detective after the arrest.  (Apr. 15, 2021 Tr. at 64:2-4.)

had been on the Brooklyn North Anti-Crime team for approximately seven months, and had

made approximately 100 arrests for gun possession over the course of his career with the NYPD.

(April 15, 2021 Tr. at 63-64.)[4]  On May 15, 2019, the officers were patrolling the Crown Heights

neighborhood in Brooklyn to address an "uptick" in felonies, including shootings and robberies.

(*Id.* at 16:5-8.)  The officers were wearing body cameras; Herrera's was in the middle of his

chest.[5]  (ECF No. 20.)  At approximately 11:15 p.m., they saw a car parked on the sidewalk in

front of a sign that read, "No Standing."  (April 15, 2021 Tr. at 16:10-24, 27:4-10, 72:11-20.)

Three men near the car were drinking what appeared to be alcohol, (*id.* at 17:21-23, 73:16-22,

74:8-14), and as the officers approached the group, Herrera and Doyle smelled alcohol.  (*Id.* at

17:21-25, 75:9-11.)  Doyle also smelled marijuana and saw the men smoking.  (*Id.* at 17:10-20.)

Doyle, who got to the group first, focused on the three men outside the car because they

were drinking; the defendant, who was sitting in the car, was not "committing the violations."

(*Id.* at 20:19-24.)  As Herrera followed Doyle with his flashlight, (*id.* at 19:10-23), he saw the

defendant sitting in the driver's seat of the car, with the door open and one of his legs outside.

(*Id.* at 76:16-77:11.)

Herrera then saw the defendant move his right hand, as though he was "pushing

something in front of his pants, pushing down something" "inside the groin."  (*Id.* at 77:12-78:9.)

Herrera thought that the defendant might have a gun because in his experience, "a lot of people

who carry guns, they usually put it in their waistband or on the side or in the front of his body."

(*Id.* at 78:23-79:1.)  Herrera said to Doyle, "He put something down there," (*id.* at 22:4-9), and

---

[4] Parenthetical references preceded by "April 15, 2021 Tr." and "April 19, 2021 Tr." are to the transcript
from the hearings held on April 15, 2021 and April 19, 2021, respectively.  The parenthetical reference
preceded by "Sept. 16, 2021 Tr." is to the transcript from the oral argument held on September 16, 2021.

[5] In May of 2019, according to the police department's patrol guide, officers were to activate their body
cameras when they interacted with someone they suspected of criminal activity.  (Apr. 15, 2021 Tr. at
51-53.)

directed the defendant to step out of the car.  (*Id.* at 79:22-81:5.)  As he and Doyle patted the defendant's waist area, Herrera saw a "big bulge, a wide bulge" in the defendant's groin area. (*Id.*)  He touched the bulge and felt the barrel of a gun, (*id.* at 81:6-10), telling Doyle that the defendant was "good," which Doyle understood to mean that the defendant had a gun.  (*Id.* at 81:11-14.)  The defendant said, "You got me."  (*Id.* at 81:15-17.)  As Herrera started to handcuff him, the defendant struggled, knocking Herrera's body camera to the ground.  (*Id.* at 81:20-82:11, 87:23-88:4.)  After the officers managed to handcuff the defendant, (*id.* at 23:23-25), Hughes told Herrera, "It's down on the leg."  (*Id.* at 29:13-16.)  Herrera found the gun below the defendant's knee.  (*Id.* at 82:11-83:3.)  The officers then put the defendant in their car.

At that point, one of the men outside the car—Ainsworth Ferril—asked Doyle, "Can I just take my bottle and get out of here?"  (*Id.* at 30:20-21.)  Doyle drove the defendant's car to the precinct, (*id.* at 31:7-13), and did an inventory search of the car, finding a bottle of Hennessy under the front passenger seat.  (*Id.* at 31:14-32:6.)[6]

Ainsworth Ferril testified for the defense.[7]  On May 15, 2019, he met the defendant and two other men on St. Marks Avenue.  (April 19, 2021 Tr. at 57-59.)  The defendant's car was in a spot that was "technically" "not a park," because "[y]ou can get a ticket if you leave it there." (*Id.* at 84:19-22.)  He was not drinking or smoking marijuana.  (*Id.* at 67:3-21.)  Police officers pulled up and asked what Ferril was doing.  (*Id.* at 65:8-10.)  Ferril responded, "Nothing," and they drove away.  (*Id.* at 65:8-23.)  But "not too long after," the officers returned, and one officer

---

[6] The next day, May 16, 2019, a detective asked to speak with the defendant, and the defendant said, "You think I'm stupid?  I'm not going to help you build a case against me."  (ECF No. 19 at 4.)

[7] In a sworn affidavit submitted with the defendant's motion to suppress, the defendant claimed that he was parked on the street, not the sidewalk, talking to a friend and waiting for a parking spot to open up. (ECF No. 19-1 ¶ 1.)  According to the defendant, the officers approached him.  (*Id.* ¶ 2.)  One of the officers searched his friend, and another ordered the defendant out of the car.  (*Id.*)  The defendant "never reached towards [his] waistband or placed anything in [his] waistband," and "there was no bulge in [his] waistband."  (*Id.*)

frisked him, (*id.* at 65:23-66:17), and went into his pockets.  (*Id.* at 66:10-67:2.)  As Ferril faced

the officer, (*id.* at 90:7-11), another officer approached the defendant.  (*Id.* at 68:12-69:7.)  The

officer asked the defendant "the same questions [the other officer] asked [Ferril]," like "you got

any weapons," and the defendant "lifted his shirt."  (*Id.*)  Ferril did not see the defendant touch or

put anything in his waistband.  (*Id.* at 69:8-18.)  The officers pulled the defendant out of the car

and searched him.  (*Id.* at 69:18-22.)  The defendant struggled with the officers, (*id.* at 69:23-

70:5), and was arrested.  (*Id.* at 70:6-8.)

     **a.  Body Camera Footage**

     Footage from the three officers' body cameras shows the defendant's car in front of a

sign that reads, "No Standing Anytime;" the car is partially on the sidewalk and partially in the

street on an area painted with white stripes, and three men are standing outside the car.  (ECF

Nos. 20-1 ("Ex. A") at 0:00-0:27; ECF No. 20-2 ("Ex. B") at 0:00-0:19, 2:45-3:03.)  The driver's

side door is open and the defendant is seated in the driver's seat with one leg outside the car;

there is a cup on the hood of the car.  (Ex. A at 0:26-0:28; ECF No. 20-3 ("Ex. C") at 0:46-0:49.)

Doyle approaches Ferril and pats down his waist area.  (Ex. C at 0-0:22.)  As Herrera walks

toward the car, the defendant leans to his left, slightly out of the car, and shifts in his seat.  (Ex.

A at 0:27-0:32.)  Herrera aims his flashlight at the defendant's groin area.  (Ex. A at 0:32-0:38;

Ex. B at 0:26-0:32.)  When the defendant lifts up his sweatshirt, Doyle also shines his flashlight

into the car.  (Ex. B at 0:32-0:38; Ex. C at 0:29-0:35.)

     At that point, Doyle helps the defendant out of the car, and Doyle and Herrera pat down

the defendant's clothing in his waist area, beginning with the sweatshirt pouch.  (Ex. A at 0:32-

0:42; Ex. B at 0:34-0:47; Ex. C at 0:33-0:46.)  When Doyle starts to pat the defendant's chest

area, Herrera redirects Doyle's flashlight back to the defendant's waist, and then pats a square-

shaped bulge in the defendant's groin area.  (Ex. A at 0:42-0:47.)  The officers turn the defendant

to face the car, and start to handcuff him.[8]  (Ex. A at 0:47-0:58; Ex. B at 0:58-1:45; Ex. C at 0:49-1:04.)  The defendant initially cooperates, but suddenly lurches and struggles, knocking Herrera's body camera to the ground.[9]  (Ex. A at 0:58-2:44; Ex. B at 0:58-1:45; Ex. C at 1:04-1:45.)  After the officers subdue the defendant, (*id.*),[10] Hughes says, "It's right here, on the leg." (Ex. B at 1:45-1:51; Ex. C at 1:45-1:50.)  Herrera asks, "The leg?" and Hughes replies, "Yeah." (Ex. B at 1:50-1:55; Ex. C at 1:45-1:50.)  Herrera says, "Yeah, I got it right here, he's got it right here."  (Ex. B at 1:53-1:57; Ex. C at 1:50-1:52.)

Next, the officers move the defendant to their car.  (Ex. A at 2:22-2:48; Ex. B at 2:10-2:54.)  Herrera asks, "Whose car is that?" and the defendant responds, "That's my friend's car," and asks if he could give his friend the keys.  (Ex. A at 3:45-3:58.)  The defendant tells the officer that the keys are in his sweatshirt pocket; the officer removes the keys and gives them to another officer.  (*Id.* at 4:00-4:15.)  The defendant complains that the handcuffs are tight, and tells Herrera, "I just got shot."  (*Id.* at 4:25-4:40.)  Herrera responds, "I got you what you're doing when I approached you, ok?  Alright my man?  That's fine, that's fine, that's fine.  I understand that, I understand that.  But I saw you, what you put in your pockets, okay?  Under in here.  Alright?  That's why I said step out.  And you tried to run from me."  (*Id.* at 4:40-4:47.) As Herrera tells the defendant that he saw what the defendant put "under in here," Herrera pats the defendant's lower waist area.  (*Id.*)

---

[8] At this point, Herrera activates the sound on the camera.  According to Doyle, the body cameras were constantly recording "but you have to activate it," and once activated, "it shows the video of what happens a minute prior . . . the minute before does not have audio, but when I press it and activate it, that's when the audio starts [for the recording going forward]."  (Apr. 15, 2021 Tr. at 26:18-25.)

[9] Herrera eventually picks his camera back up.  (Ex. A at 2:09-2:15.)

[10] Bystanders yell at the officers, and Doyle and Hughes direct them away from the car.  (Ex. B at 2:44-4:07; Ex. C at 2:40-4:40.)

Meanwhile, Ferril asks Doyle, "Can I get my, can I get my bottle?" and Doyle responds, "Just give us a second."  (Ex. B at 3:50-4:00.)  Ferril responds, "Just get me my bottle and [unintelligible]."  (*Id.*)

## II.     July 14, 2020 Arrest

On July 10, 2020, the Honorable Roanne L. Mann issued a federal arrest warrant authorizing the defendant's arrest for violating 18 U.S.C. § 922(g), being a felon in possession of a firearm.  (ECF No. 2.)  Detective James Grzelak of the NYPD—who swore out the affidavit for the warrant—knew about the circumstances of the defendant's May 15, 2019 arrest and had spoken to detectives about it.  (April 19, 2021 Tr. 28:5-7.)  He also knew that the defendant had a pending case in Queens County.  (*Id.* at 28:8-10.)  On July 14, 2020, members of the Homeland Security Investigations ("HSI") Violent Gang Task Force, including Grzelak, went to the defendant's apartment to arrest him on the federal charge.  (*Id.* at 6:12-8:8.)  Grzelak "knew [the defendant] had an attorney in [a] pending case" so the team was "just going to pick [the defendant] up, [and] transport him straight to court."  (*Id.*)

When they arrived at the defendant's apartment, the defendant asked why he was being arrested.  (*Id.* at 9:7-17.)  Grzelak explained that "the charges were 922(g), felon in possession," and "[i]mmediately, I followed with *Miranda*.  I read him *Miranda*."  (*Id.*)  The defendant interrupted Grzelak as he advised him of his rights, and "said that he wanted to speak to his attorney."  (*Id.* at 9:15-10:8.)  The defendant called his attorney, Dawn Florio, and told her, "I've been arrested."  (*Id.* at 10:19-21.)  Grzelak did not "remember the rest of" what the defendant said.  (*Id.*)  Then the defendant handed Grzelak the phone and asked, "Can you speak to her?" (*Id.* at 10:22-11:3.)  Grzelak spoke with Ms. Florio, whom he knew from other cases.  (*Id.* at 11:4-24.)  He told her that the defendant was charged with being a felon in possession, and

confirmed that the federal charge was related to the defendant's pending case.[11] (*Id.*)  Ms. Florio

made "some brief statement about retained . . . like there was something about retainer."  (*Id.* at

11:25-12:3.)  Grzelak did not recall whether Ms. Florio told him not to speak to the defendant; in

any event, Grzelak did not plan to speak to the defendant because he had counsel.  (*Id.* at 12:15-

20, 29:18-30:12.)[12]

       When they got outside, the defendant asked Grzelak, whom he just met, "Are you riding

with me?"  (*Id.* at 14:7-16.)  Grzelak replied that he was going in another car.  (*Id.*)  The

defendant asked again, "Can you ride with me?  Can you come with me?"  (*Id.*)  Grzelak told the

defendant that "anything he says to me in that car will be used against him."  (*Id.*)  Nevertheless,

the defendant asked, "Can you please ride with me?"  (*Id.* at 14:17-15:2.)  Grzelak agreed.  (*Id.*)

       During the twenty minute ride**,** the defendant said that he was "a little frustrated" and

"overwhelmed."  (*Id.* at 14:25.)  He told a "rambling story," and said that he was "trying to do all

the right things," that he was "trying to go legit" and "stay out of trouble."  (*Id.* at 16:1-9, 19:17-

20.)  The defendant also described his music production company, and his efforts to get different

people from the community to rap together.  (*Id.* at 16:25-17:4.)  Grzelak "stopped" the

defendant and said, "Sharif, I have watched the 50/50 video.  I know the video.  I know the

music.  I know what 50/50 means, neutral.  But, you know, having guys like [gang leader] Nuke

in your video, you know, that's part of the problem."  (*Id.* at 16:25-17:4.)  Grzelak also "advised

him that having Aljermiah Mack"—a gang member whom Grzelak had investigated—"in the

video is not removing you from [the gang] Nine Trey when I know you're Nine Trey."  (*Id.* at

---

[11] The defendant also had a pending Queens Supreme Court case in which he was charged with weapons
possession.  *People v. Alleyne*, No. 2019-01284 (N.Y. Sup. Ct. July 25, 2019).

[12] The defendant also asked to call the mother of his child because their young daughter was in the
apartment.  (Apr. 19, 2021 Tr. at 10:7-8.)

37:14-20.)  Grzelak said that "it's not a good idea and that being in a rap video promoting

'neutral,' which means not gang membership, should not have the leader of Nine Trey Gangster

Bloods, one of the street lineup, just featured in it for just any reason.  It doesn't make sense."

(*Id.* at 38:10-17.)

At that point, the defendant "continued" by describing the facts of his Queens case,

saying, "All I wanted to do is go out and have a night out with my friend, my brother.  I wanted

to go to a club.  And the next thing that happened to me I go to a club with my best friend, we are

just having a few drinks, some guys fight, I get in between, I try to stop the fight . . . I try to do

the right thing there and I'm driving away and my friend gets killed, my brother gets killed."  (*Id.*

at 17:3-18.)  The defendant "tr[ied] to defend" himself during the attack and reached for a gun on

the floor of his car.  (*Id.*)  The defendant was "devastated" and "crying and breathing heavy" as

he described the shooting.  (*Id.* at 17:19-20, 20:22)  Grzelak said that he was "sorry for [the

defendant's] loss" but that the defendant "need[ed] to be telling your attorney these stories.  You

need to tell them—the attorney your side.  You can sit down with prosecutors.  You can, you

know, work out some type of agreement with the Federal Government."  (*Id.* at 21:4-21.)  The

defendant responded, "Be a fucking rat?" and Grzelak replied, "Whatever you call it, but those

are your options."  (*Id.*)

Then, according to Grzelak, the defendant "spoke about an incident"—the facts of this

case.  (*Id.* at 22:11-23:4.)  He said that he was "drinking alcohol" and "just hanging out with his

friends," when "a guy inside of the car had a firearm" and "then like passed it over to" the

defendant.  (*Id.*)  The defendant "kind of looked at" Grzelak and said, "You want me to

cooperate, but like I fucked, like I fucked up and this guy fucked me."  (*Id.*)  Grzelak responded,

"You should not be putting yourself in these positions, that's part of the problem."  (*Id.* at 23:5-

16.)  The defendant replied, "What am I supposed to do?  If it was out there, I'd rather, like, kill than be killed, what don't you understand?"  (*Id.*)

The defendant asked Grzelak to "be real" with him, and Grzelak "explained to him that it's not like the State, you will see the judge today, and the judge will make a decision" about whether the defendant would be released on bail.  (*Id.* at 23:17-24:11.)  The defendant asked, "Be real, am I getting out today?" and Grzelak responded, "If you want me to be honest with you, I do not think you're getting out today.  I think you're going to get detained because of your history."  (*Id.*)  The defendant "asked one more time, like is it possible, like it is possible for me to get bail?" and Grzelak said, "Anything's possible."  (*Id.* at 24:12-21.)  At that point, "that was pretty much the end of the conversation."[13]  (*Id.*)

## DISCUSSION

### I.  Fourth Amendment

The defendant moves to suppress the gun and his post-arrest statements.  (ECF No. 19 at 6.)  "On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure."  *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980)).  Once the defendant has shown a basis for his motion, the burden shifts to the government to demonstrate that the search or seizure did not violate the Fourth

---

[13] In an affidavit, the defendant claims that Grzelak spoke with him "about the events and individuals relating to my open Queens County gun case," and "made references" to the defendant having "lawyered up;" he offered to speak to him "off the record."  (ECF No. 19-1 ¶ 9.)  The detective talked "about the shooting," "for the most part making statements to which [the defendant] occasionally responded."  (*Id.*)  In another affidavit, the defendant's lawyer, Kannan Sundaram, described a conversation with attorney Dawn Florio about the events of July 14, 2020.  (ECF No. 19-2.)  Ms. Florio got a text message from the defendant that federal officers were taking him into custody; she called the defendant and also spoke with Grzelak.  (*Id.* ¶ 4.)  She told the defendant "not to speak to the agents," (*id.* ¶ 5), and instructed Grzelak "not to question" the defendant.  (*Id.* ¶ 6.)

Amendment.  *Id.* (citing *Arboleda*, 633 F.2d at 989, *United States v. Perea*, 986 F.2d 633, 639

(2d Cir. 1993) and *United States v. Pena*, 961 F.2d 333, 338-39 (2d Cir. 1992)); *see United*

*States v. Bristol*, 819 F. Supp. 2d 135, 142 (E.D.N.Y. 2011) (noting that, on a motion to suppress,

the government "bears the burden of proving, by a preponderance of the evidence, that

reasonable suspicion existed for a stop").  The parties do not dispute that the police officers

seized the defendant and searched him without a warrant.  Thus, the government bears the

burden to demonstrate that the officers had reasonable suspicion to frisk the defendant.

### a.  Stop

Police officers "may briefly detain an individual for questioning if they have a reasonable

suspicion that criminal activity is afoot, and may frisk him if they reasonably believe he is armed

and dangerous."  *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007); *see also Arizona v.*

*Johnson*, 555 U.S. 323, 326-27 (2009) (stating that a "stop and frisk" does not violate the Fourth

Amendment when the officer "reasonably suspects that the person apprehended is committing or

has committed a criminal offense," and "reasonably suspect[s] that the person stopped is armed

and dangerous").  The reasonable suspicion standard is "not high."  *Richards v. Wisconsin*, 520

U.S. 385, 394 (1997); *see also United States v. Sanders*, 208 F.3d 204 (2d Cir. 2000)

("'Reasonable suspicion' is a 'rather lenient' test that is measured using the perspective of a

trained and experienced law enforcement officer." (quoting *United States v. Santana*, 485 F.2d

365, 368 (2d Cir. 1973))).  The standard "merely requires that a police officer be able to point to

specific and articulable facts which, taken together with rational inferences from those facts,

reasonably warrant that intrusion on the citizen's liberty interest."  *United States v. Weaver*, 9

F.4th 129, 140 (2d Cir. 2021) (internal quotation marks and alterations omitted).

Because the reasonable suspicion standard "takes into account the totality of the

circumstances," *Navarette v. California*, 572 U.S. 393, 403 (2014) (internal quotation marks

omitted), a "mosaic" of factors can form the basis for a reasonable suspicion, including "the suspect's behavior, the context of the stop, and the crime rate in the area." *Weaver*, 9 F.4th at 140 (citing *Ornelas v. United States*, 517 U.S. 690, 698 (1996)).  While a reasonable suspicion demands "more than a hunch," *United States v. Manuel*, 647 F. App'x 11, 12 (2d Cir. 2016) (citing *United States v. Singletary*, 798 F.3d 55, 59 (2d Cir.2015)) (internal quotation marks omitted), an officer may "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." *United States v. Padilla*, 548 F.3d 179, 188 (2d Cir. 2008) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (internal quotation marks omitted).

A stop "must be justified at its inception," *Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020) (internal quotation marks omitted), and a reviewing court "must examine the facts that preceded the frisk," *Weaver*, 9 F.4th at 140, keeping in mind that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 140-41 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  Officers "responding to 'swiftly developing situations' . . . need not ignore developments that confront them.'" *Id.* at 141 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)) (internal alterations omitted).  The court makes "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time and not on the officer's actual state of mind at the

time the challenged action was taken." *United States v. Scopo*, 19 F.3d 777, 783 (2d Cir. 1994) (internal quotation marks omitted).[14]

Applying these principles, I conclude that Officer Herrera's actions were "supported by objective and articulable facts that gave rise to a reasonable suspicion" that a crime was being committed. Herrera, patrolling the area due to an increase in violent crime, saw the defendant sitting in a car that was parked partially on the sidewalk and directly in front of a "No Parking" sign. Other men near the car were drinking what appeared to be alcohol; there was also a cup on the hood of the defendant's car, and Herrera and Doyle smelled alcohol. In addition, Doyle smelled marijuana and saw three individuals smoking.[15] These observations warranted investigation.

Drinking or having an open container of alcohol in public violates New York City Law. *See* N.Y.C. Admin. Code § 10-125(b). I credit the officers' testimony about these observations, which is corroborated by the video evidence of the plastic cup on the hood of the defendant's car, (Ex. A at 0:26-0:28), as well as Ainsworth Ferril's question to Doyle after the defendant's arrest about whether he could "just get [his] bottle."[16] Based on this evidence, the officers had a reasonable basis to investigate whether the men, including the defendant, were drinking in public and had an open container of alcohol in violation of city law. *See Singletary*, 798 F.3d at 63

---

[14] While not dispositive, encounters in a "high crime area" are "among the relevant contextual considerations" in reasonable suspicion analysis. *Padilla*, 548 F.3d at 183, 188 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). So too is the time of day. *See United States v. Bayless*, 201 F.3d 116, 134 (2d Cir. 2000) (stating that "sometimes innocuous factors such as the time of day" can take on "added significance" when considered with other factors); *United States v. Blake*, No. 16-CR-194, 2017 WL 626603, at *4 (E.D.N.Y. Feb. 15, 2017) (finding reasonable suspicion after considering, among other factors, that the suspect was "in a high-crime area" late at night).

[15] Counsel conceded at oral argument that the officers had evidence of a parking violation, but disputed whether the officers saw any of the men drinking or smoking marijuana. (Sept. 16, 2021 Tr. at 3:3-14.)

[16] This evidence also undermines Ferril's testimony at the hearing that no one was drinking.

("[T]he officers' observations of [the defendant] walking down a public street, carrying a beer-sized can wrapped in a brown paper bag, which object he held in a cautious manner so as to avoid spillage, are articulable, objective facts that together provided reasonable suspicion to support a brief stop to investigate whether [the defendant] was then violating a local open-container ordinance."); *United States v. Diaz*, 122 F. Supp. 3d 165, 173 (S.D.N.Y. 2015) ("[The officer] indisputably had probable cause to believe that [the defendant] was drinking alcohol or possessing alcohol with the intent to drink it.  As noted, [the officer] observed [the defendant] holding a red Solo cup containing a clear liquid while sitting in close proximity to an open bottle of vodka.  In addition, she smelled alcohol on [the defendant's] breath and in the cup he had been holding.  Those observations were more than sufficient to establish probable cause to believe that [the defendant] was drinking alcohol." (citations omitted)), *aff'd*, 854 F.3d 197 (2d Cir. 2017).

In May of 2019, New York State Penal Law prohibited the knowing and unlawful possession of marijuana.  *See* N.Y. Penal Law § 221.05 (2019); *United States v. Watson*, No. 20-CR-346, 2021 WL 535807, at *3 (S.D.N.Y. Feb. 11, 2021) ("Because possession of marijuana is illegal in the State of New York, reasonable suspicion of marijuana possession can form the basis of a valid stop." (citing *United States v. Bignon*, 813 F. App'x 34, 35-36 (2d Cir. 2020))).  Doyle smelled marijuana and saw a group of individuals smoking; smelling marijuana establishes reasonable suspicion "that criminal activity was afoot."  *United States v. Daniels*, No. 21-CR-81, 2021 WL 4690837, at *7 (E.D.N.Y. Oct. 7, 2021); *see also United States v. Garcia*, No. 18-CR-178, 2018 WL 3407707, at *4 (S.D.N.Y. June 5, 2018) (finding reasonable suspicion where the smell of marijuana provided an "objective basis for suspected legal wrongdoing").

In addition, the defendant was violating New York State Vehicle and Traffic Law by parking on the sidewalk in a no-standing area.  Stopping a car in a no-standing area violates the

New York State Vehicle Traffic Law ("VTL") and the Rules of the City of New York.  *See* VTL § 1200(b); Rules of the City of New York, tit. 34, § 4-08(a)(3), as does parking on the sidewalk, *see* VTL § 1202(a)(1)(b); Rules of the City of New York, tit. 34, § 4-08(e)(3).  These violations may serve as the basis for reasonable suspicion.  *See United States v. Grady*, 645 F. App'x 1, 2-3 (2d Cir. 2016) (observing a car parked on the wrong side of the street in violation of a parking ordinance gave "the requisite reasonable suspicion of a parking violation" to justify a *Terry* stop, even if the officers did not "conduct surveillance long enough to rule out the possibility of innocent conduct") (internal citations and quotation marks omitted); *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("A seizure for a traffic violation justifies a police investigation of that violation.").

### b.  Frisk

Officers who have made a lawful investigatory stop, and reasonably suspect that the individual stopped is armed, may conduct a protective frisk for weapons.  *See Bailey*, 743 F.3d at 332 ("To support an accompanying patdown, there must be a reasonable basis to think 'that the person stopped is armed and dangerous.'" (quoting *Johnson*, 555 U.S. at 326-27)); *see also Weaver*, 9 F.4th at 139 ("A police officer must have a reasonable suspicion not only that criminal activity is afoot, but also that the person suspected is 'armed and dangerous.'" (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968))).  The standard for reasonable suspicion to justify a protective frisk is similar to justifying an investigatory stop; it must be based on "specific and articulable facts" which provide a reasonable basis to conclude that the person stopped "may be armed and presently dangerous."  *Bailey*, 743 F.3d at 332 (citations and internal quotation marks omitted).  If reasonable suspicion is present, the officer "may take steps to assure [him]self that the person with whom [ ]he is dealing is not armed with a weapon that could unexpectedly and fatally be

used against h[im]." *United States v. Wilson*, 94 F. App'x. 14, 15-16 (quoting *United States v. Salazar*, 945 F.2d 47, 49 (2d Cir. 1991) (internal quotation marks omitted)).  "The dangers of traffic stops—to both police officers and individuals—are well known and long recognized." *Weaver*, 9 F.4th at 143; *see also Michigan v. Long*, 463 U.S. 1032, 1047 (1983) (recognizing that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers").

The evidence establishes that during this night-time encounter, Officer Herrera, a nine-year veteran of the New York Police Department, had reasonable suspicion that the defendant was armed.  As Herrera walked toward the car, he saw the defendant make a movement as though he were "pushing something in front of his pants, pushing down."  These movements were, in Herrera's experience, consistent with concealing a gun because "a lot of people who carry guns, they usually put it in their waistband."  He alerted Doyle that the defendant had "put something down there."  Doyle assisted the defendant out of the car, and both officers patted the area around the defendant's waist, including his sweatshirt, before Herrera patted the visible bulge just below the defendant's waist, and felt the barrel of a gun; at that point, he told Doyle that the defendant was "good"—meaning that he had a gun—and the officers started to arrest him.  This entire sequence of events—from when Herrera saw the defendant's movement until the discovery of the gun—took approximately 24 seconds; the frisk itself—from the time the officers started patting down the defendant's waist area until Herrera felt the gun—took approximately eight seconds.[17]

---

[17] That Doyle frisked Ferril before Herrera reached the car does not change the analysis.  The question is whether there was a justifiable frisk of the defendant.  To the extent that the defendant argues that the frisk of Ferril is evidence of Herrera's subjective intent, *Weaver* reaffirmed that the standard is an objective one.  *See Weaver*, 9 F.4th at 145 (holding that "a police officer's subjective intentions bear no weight in determining whether a search has occurred").

In seeking suppression, the defendant makes the following arguments.  First, he says that I should not credit Herrera's testimony that he saw the defendant appear to push something in his waist area, because the officer's body-worn camera does not show that movement.  In my view, however, the camera's footage is inconclusive, and that it did not capture everything that Herrera saw is not a reason to discredit his testimony, which I find to be credible.[18]  The camera was at about Herrera's chest level, and by its location, would not capture everything that Herrera saw, especially since it was dark and Herrera was using his flashlight.  Moreover, all of Herrera's actions were consistent with having seen something that led him to believe that the defendant was armed.  He did not approach the men outside the car, but went directly to the defendant, keeping his flashlight directed at the defendant's waist and groin area.  Doyle then turned immediately from Ferril to the defendant, and assisted him out of the car; actions consistent with Herrera having alerted him that he saw the defendant put something down his waist.[19]

---

[18] The defendant also urges that the officers' failure to activate the audio function on their body-worn cameras deprives the Court of the best evidence of what happened during the encounter between the officers and the defendant, and requires suppression.  (Sept. 16, 2021 Tr. at 49:2-54:2.)  While it would have been the better practice to activate the audio function earlier in the encounter, I do not agree that failure to do so requires suppression in the context of these facts.  The case the defendant cites, *United States v. Garcia*, No. 1:19-CR-410, 2021 WL 3516447 (E.D.N.Y. Aug. 10, 2021), is much different.  In *Garcia*, the officer did not activate his body camera at all, and then offered "several unconvincing reasons why he failed to do so." *Id.* at *8.  Moreover, the civilian witness contradicted his testimony. *Id.*  Here the officers activated the video function for the entire encounter.

[19] The defendant maintains that the frisk began when Doyle helped the defendant out of the car.  But Doyle did no more than assist the defendant out of the car, which as the Second Circuit observed in *Weaver*, was a reasonable safety measure and means of maintaining control of someone whom they suspected was armed.  *See Weaver*, 9 F.4th at 143 (stating that officers may take "a host of sensible safety measures that in no way constitute searches" yet involve touching, like "handcuff a suspect, secure him in the back of a patrol car, or order him to lie on the ground, move to another location, stand against a wall, or . . . stand with his hands on the trunk of a car."); *see also United States v. Gori*, 230 F.3d 44, 56 (2d Cir. 2000) ("[I]t is well established that officers may ask (or force) a suspect to move as part of a lawful Terry stop."); *Johnson*, 555 U.S. at 331 ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendmen[t].") (internal citations and quotation marks omitted).

The defendant's claim that the frisk "encroached into the territory of a full-blown search," (ECF No. 37 at 2), is not supported by the evidence.  In fact, Herrera focused on the area where he had seen the defendant making the movement—his waist area.  He and Doyle spent a few seconds on the pockets of the defendant's sweatshirt, and when Doyle started to pat the defendant's chest area, Herrera—who saw the defendant's movement—redirected Doyle's flashlight down to where he had seen the defendant make the movement.  It was at that point the officer felt the bulge below the defendant's waist—a bulge that is visible on the video—and alerted Doyle that he found the gun.  These actions—going immediately to the defendant, focusing on the defendant's waist and groin area and confining the frisk to that area— corroborate Herrera's testimony about his initial observations of the defendant appearing to have put something in his waist area.  Herrera's testimony is further corroborated by his conversation with defendant minutes later, when the defendant was seated in the officers' car.  The defendant complained that his handcuffs were too tight and that he "just got shot;" Herrera replied, "I got you what you're doing when I approached you, ok . . . But I saw you, what you put in your pockets, okay?  Under in here," as he patted the defendant's lower waist area.

The defendant also argues that Herrera's observations had an innocent explanation—for example, that his movements "only indicated a general intent to conceal something from the police as opposed to a specific intent to hide a weapon."  (ECF No. 29 at 20.)  But as the Second Circuit reaffirmed in *Weaver*, "[a] police officer, placed into an uncertain and developing situation, is not tasked with sorting through multiple possible scenarios and conducting a frisk for weapons only if that is the sole, or even the most likely possibility."  *Weaver*, 9 F.4th at 149. On the contrary, "the purpose of the protective search is to allow an officer to do his job safely." *Id.*; *see also Padilla*, 548 F.3d at 187; *United States v. Blake*, No. 16-CR-194, 2017 WL 626603,

at *4 (E.D.N.Y. Feb. 15, 2017) (finding reasonable suspicion when a person was "in a high-crime area" late at night, an officer "observed him shift an object from the side of his waist to the groin area" and the officer "noticed an L-shaped object in the groin area," which, based on the officer's training and experience, led him to believe the suspect had a firearm); *United States v. Garcia*, 279 F. Supp. 2d 294, 300 (S.D.N.Y. 2003) ("After opening the door and observing [the defendant] making furtive movements in an apparent attempt to conceal a 'bulge' in his waist area . . . [the officer] was justified in patting [the defendant] down to determine whether he was carrying a weapon."); *Padilla*, 548 F.3d at 183 (finding reasonable suspicion that a suspect was armed when the suspect "reach[ed] underneath his jacket and shirt, adjust[ing] something in the center of his waistband" that "appeared to have some weight to it because of the way it shifted and the way [the defendant] moved his hand"); *United States v. Manuel*, 64 F. App'x 823, 826-27 (2d Cir. 2003) ("Upon concluding that the stop was lawful, we find that [the officer's] frisk was justified, because the bulge in [the defendant's] waist area permitted him to conclude . . . was armed and posed a danger to the officers." (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111-12 (1977)); *United States v. Dekattu*, No. 18-CR-0474, 2019 WL 1091384, at *4 (E.D.N.Y. Mar. 8, 2019) ("Courts have regularly found that physical movements indicative of carrying a concealed firearm can contribute to a finding of reasonable suspicion.").

In this rapidly unfolding set of events, officers observed three violations of the law—the public drinking, the vehicle infraction and the marijuana—and were justified in approaching the defendant and directing him out of the car.  Herrera's additional observation—the defendant

18

pushing something into his waist—warranted the limited pat down in the defendant's waist area.

Accordingly, the defendant's motion to suppress is denied.[20]

## II.    Fifth Amendment

The defendant moves to suppress statements he made to Detective Grzelak after he was

arrested on the federal charges, at a time when he was represented by counsel.  (ECF No. 19.)

The defendant argues that Grzelak's statements to the defendant were the functional equivalent

of interrogation.  (*Id.* at 8.)  The government concedes that the defendant invoked his right to

counsel under *Miranda v. Arizona*, 384 U.S. 436 (1966), but maintains that the defendant waived

his right to counsel and that his statements to Grzelak were spontaneous and unsolicited.  (ECF

No 20 at 19; ECF No. 36 at 2; ECF No. 29 at 31.)[21]

The government "has the burden of proving by a preponderance of the evidence that a

defendant made his statements spontaneously and not as the result of custodial interrogation."

*United States v. Choudhry*, 24 F. Supp. 3d 273, 279 (E.D.N.Y. 2014), *aff'd*, 649 F. App'x 60 (2d

Cir. 2016) (quoting *United States v. Annucci*, No. 06-CR-982, 2007 WL 1310156, at *4

(S.D.N.Y. May 3, 2007)).  Similarly, the government must prove waiver by a preponderance of

the evidence.  *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986) ("Whenever the State bears

the burden of proof in a motion to suppress a statement that the defendant claims was obtained in

---

[20] Because I conclude that the defendant's arrest was lawful, I deny the defendant's motion to suppress the DNA recovered from the gun, as well as the motion to suppress the defendant's statement to a detective on the day after his arrest.

[21] Although the defendant's lawyer was actively involved—the defendant spoke to her, and she spoke to Grzelak—the subsequent conversation between Grzelak and the defendant does not implicate the Sixth Amendment because formal proceedings had not yet been initiated.  *See United States v. Moore*, 670 F.3d 222, 233-34 (2d Cir. 2012); *United States v. Gouveia*, 467 U.S. 180 (1984).

violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence."); *United States v. Capers*, 627 F.3d 470, 480 (2d Cir. 2010).

There is no dispute that the defendant invoked his right to counsel within moments after Grzelak and federal agents arrived at his apartment.  He stopped Grzelak as Grzelak was reading him the *Miranda* warnings and asked to speak with his lawyer, who represented him in the open Queens gun case.  The defendant spoke to his lawyer, who then spoke to Grzelak.  Grzelak could not remember whether the attorney told him not to speak to the defendant.  Given the circumstances, however, it is almost inconceivable that she would not have told him to refrain from questioning her client.[22]  In any event, Grzelak knew that he could not question the defendant because he had a lawyer.  Accordingly, any statements that the defendant made after invoking his right to counsel had to be spontaneous "and not the result of interrogation." *United States v. Colon*, 835 F.2d  27, 30 (2d Cir. 1987) (*citing Arizona v. Mauro*, 481 U.S. 520, 525 (1987)).  Interrogation is both "express questioning and its 'functional equivalent,' including 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).  Moreover, "[i]f there is questioning after the arrestee invokes his [Fifth Amendment] right to counsel, his responses may be admitted in evidence only on finding that [the arrestee] (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *United States v. Miller*, 116 F.3d 641, 680 (2d Cir. 1997) (citing *Smith v. Illinois*, 469 U.S. 91, 95 (1984)) (internal quotation marks omitted); *see also Berghuis v. Thompkins*, 560 U.S. 370 (2010) ("If the State establishes that a *Miranda*

---

[22] According to the affirmation the defendant's counsel submitted in connection with his motion to suppress, Ms. Florio told Grzelak not to question the defendant.  (ECF No. 19-2 ¶ 6.)

warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver.").

According to the government, the defendant waived his right to counsel because he "affirmatively asked to speak to Detective Grzelak during the car ride to the courthouse," (ECF No. 36 at 3), and then spoke with "Detective Grzelak spontaneously for a period of about 20 minutes" during the ride.  (Sept. 16, 2021 Tr. at 41:24-25, 42:8-13.)  The government points out that before the defendant was taken to court, Grzelak started to advise the defendant of his rights and that the defendant spoke to his lawyer, and also that before he got into the car with the defendant, Grzelak reminded the defendant that his statements would be used against him.  The defendant denies that he initiated a conversation with Grzelak, (ECF No. 19-1), and contends that it is "undisputed" that he refused to waive his *Miranda* right not to be questioned without the presence of counsel.  (ECF No. 29 at 29.)

Even crediting Grzelak's testimony that the defendant, who moments earlier not only invoked his right to counsel but had spoken to his lawyer, nevertheless asked a detective—whom he did not know—to ride with him and then, unprompted, started talking about the details of his two open cases, I find that the government has not met its burden of proving that the defendant "evinced a willingness and a desire for a generalized discussion about the investigation." *United States v. Lewis*, No. 96-CR-430, 1999 WL 111936, at *6 (E.D.N.Y. Mar. 1, 1999); *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (where the defendant initiated further conversation by asking, "Well, what is going to happen to me now?"); *United States v. Stewart*, 770 F. Supp. 872, 879 (S.D.N.Y. 1991) (where the defendant "evinced a willingness and a desire for a generalized discussion about the investigation" by asking what evidence the government had against him).

The defendant did not initiate a conversation about this case.  Rather, according to Grzelak, the defendant, who was extremely emotional, told a "rambling story" about his struggles and his efforts to lead a law-abiding life.  For his part, Grzelak did not simply sit and listen.  *See Edwards v. Arizona*, 451 U.S. 477, 485 (1981) (had the defendant "initiated the meeting" with law enforcement, "nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial."); *Jackson v. Conway*, 763 F.3d 115, 137 (2d Cir. 2014) ("Absent an interrogation, there can be no infringement of the Fifth Amendment rights *Miranda* was designed to protect."); *United States v. Gonzalez*, 764 F.3d 159, 165 (2d Cir. 2014) ("Once *Miranda* rights have been invoked, interrogation must stop and the invocation must be 'scrupulously honored.'" (quoting *Michigan v. Mosley*, 423 U.S. 96, 104 (1975))).  Instead, Grzelak "stopped" the defendant, told him that he had watched the defendant's music videos, and challenged him not only about featuring gang members—whom Grzelak named—in his videos, but accused him of being in a gang.  Grzelak said that "it's not a good idea and that being in a rap video promoting 'neutral' . . . should not have the leader of Nine Trey Gangster Bloods, one of the street lineup, just featured in it for just any reason.  It doesn't make sense."  The defendant responded that he was "moving away" from the gang, (Apr. 19, 2021 Tr. at 38:18-39:2), and Grzelak said, "I know you're Nine Trey."  It was at this point that the defendant described the circumstances of the open Queens case.[23]  Grzelak then proposed that the defendant cooperate with the government, which prompted the defendant to talk about this case and to explain how he was caught with a weapon, and why he could not cooperate with the government.  *See United States v. Lewis*, No.

---

[23] Even if I were to conclude that the defendant's statements about his Queens case were spontaneous and not the product of interrogation or its functional equivalent, it is hard to see how these statements would be admissible at a trial on this federal charge.

96-CR-430, 1999 WL 111936, at *6 (E.D.N.Y. Mar. 1, 1999) (finding that the defendant did not initiate the conversation because "the statements at issue were not forthcoming until after [the agent] specifically approached [the defendant], introduced himself to [the defendant], and subsequently posed two separate questions" about the defendant's association with a criminal known to both the agent and the defendant).

Under these circumstances, the defendant's statements to Grzelak cannot fairly be characterized as spontaneous. While it may be, as the government argues, that Grzelak did not ask the defendant specifically about the facts of this case, it is equally true that he did not simply listen as the defendant talked. Grzelak prompted the defendant's statements, first accusing the defendant of being a gang member—"I know you're Nine Trey"—which led to the defendant's efforts to explain that he had "removed himself from people like that," and to talk about the Queens case. Then, Grzelak told the defendant not only that he should tell his lawyer "these stories," but that he should cooperate with the government. These, according to Grzelak, were the defendant's "options." Only after Grzelak told the defendant about his "options" did the defendant explain why he could not cooperate: because he "fucked up and this guy fucked me." Grzelak should have known that recommending cooperation was "reasonably likely to elicit an incriminating response." *United States v. Hyman*, No. 18-CR-307, 2019 WL 5696840, at *2 (E.D.N.Y. Nov. 4, 2019) (quoting *Innis*, 446 U.S. at 301); *see also United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992).

For these reasons, the cases on which the government relies—*United States v. Colon*, 835 F.2d 27 (2d Cir. 1987) and *United States v. Choudhry*, 24 F. Supp. 3d 273 (E.D.N.Y. 2014)—are distinguishable, because in neither case did the defendants speak to lawyers before they made their statements, nor did their lawyers instruct the police not to talk to the defendants, as

happened here.  *Id.*  Moreover, law enforcement officials in these cases did not challenge the defendant about their criminal behavior or tell them that they should cooperate, as Grzelak did. *Id.*  Colon "was not questioned, confronted with evidence, or even encouraged to be honest and tell the facts."  *Colon*, 835 F.2d at 30.  Similarly, the agents in *Choudhr*y, 24 F. Supp. 3d at 280, "strictly refrained from asking [Choudry] any questions about the case or taking any actions to elicit statements from [him]."

The defendant, arrested by federal agents at his home over a year after his arrest for the same crime by local law enforcement, invoked his right to counsel and spoke to his lawyer, who then instructed Grzelak not to speak to her client.  In the twenty minute ride to the federal courthouse—where the defendant would be assigned counsel—Grzelak did much more than simply listen as the defendant spoke.  He interrupted the defendant, accused him of being in a gang, and advised him that cooperating with the government was his "option."  Given the "totality of all the surrounding circumstances," *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991), I find that the government has not met its burden of establishing that the defendant waived his Fifth Amendment rights or that his statements were spontaneous.

**CONCLUSION**

For these reasons, the defendant's motion to suppress his statements to Grzelak is granted. His motion to suppress the gun and the statements made after the May 15, 2019 arrest is denied.

**SO ORDERED.**

s/Ann M. Donnelly

_____

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
       November 23, 2021